Order, Supreme Court, New York County (Eileen Bransten, J.), entered August 15, 2012, which, to the extent appealed from as limited by the briefs, denied plaintiffs motion for summary judgment on liability on its breach of contract claim, granted in part defendant’s motion for summary judgment dismissing that claim, and denied defendant’s motion as to its breach of contract counterclaims, modified, on the law, to grant plaintiffs motion, to deny defendant’s motion, and otherwise affirmed, without costs.
On May 5, 2005, plaintiff BDC Finance LLC and defendant Barclays Bank FLC entered into a total return swap, a derivative transaction whereby BDC would obtain the benefits, and assume the risk, of an investment in a portfolio of corporate debt instruments in exchange for paying financing fees to Barclays, which owned the loans. The agreement was memorial *583 ized in a series of documents, including a standard form Master Agreement, a standard form Credit Support Annex (CSA), and a negotiated Master Confirmation that modified certain provisions of the standard forms.
Under the agreements, each party had the right to demand collateral from the other party based on changes in the value of the underlying debt instruments. If more collateral was needed, Barclays could make a collateral call for BDC to transfer an amount known as the “Delivery Amount.” Conversely, if collateral needed to be returned, BDC could make a collateral call for Barclays to transfer an amount called the “Return Amount.” Thus, if BDC determined that Barclays was over-collateralized, then BDC could demand the return of any excess collateral.
At issue in this case is Barclays’ alleged failure to meet a $40 million collateral call made by BDC. Barclays maintains that the agreements permitted it to dispute BDC’s collateral call by notifying BDC and making a partial payment of what Barclays considered to be the undisputed amount. In support, Barclays points to paragraph 3 (b) of the CSA, which provides that “[s]ubject to Paragraphs 4 and 5, upon a demand made by [BDC] . . . [Barclays] will Transfer to [BDC] [the amount of collateral] specified by [BDC] in that demand” (i.e., the Return Amount). Paragraph 4 (b) provides that if the demand is made by 1:00 p.m., the transfer of collateral must be made by the end of the following business day, but if the demand is made after 1:00 p.m., the transfer must be made by the end of the second business day.
According to Barclays, paragraph 5 of the CSA sets forth a mechanism for resolving disputes over the proper amount of the collateral calls. Under that provision, the disputing party is required to both notify the other party of the dispute and transfer the undisputed amount by the end of the business day following the date of the demand. The parties are then required to consult with each other in an attempt to resolve the dispute, and if that fails, they must utilize the CSA’s formal dispute resolution process.
BDC maintains that the dispute procedures contained in paragraph 5 of the standard form CSA were expressly modified by the Master Confirmation that was negotiated by the parties. The Master Confirmation contains a “Delivery of Collateral” clause that provides that “[notwithstanding anything in the [CSA] to the contrary . . . [Barclays] shall Transfer any Return Amounts . . . not later than the Business Day following the Business Day on which [BDC] requests the Transfer of such Return Amount.” Unlike the form CSA, this clause requires *584 that any transfer take place by the business day following the demand, regardless of whether the demand was made before or after 1:00 p.m. According to BDC, the Delivery of Collateral clause also nullifies the CSA’s dispute resolution procedures and requires transfer of the entire Return Amount pending resolution of a dispute, and not just the undisputed amount. In other words, BDC maintains that if Barclays disagreed with the Return Amount demanded, it was required to pay first, and dispute later. Barclays, on the other hand, contends that the Delivery of Collateral clause modified only the timing of the transfer and left intact the dispute resolution process.
As relevant here, an Event of Default occurs when a party fails to perform any obligation required under the CSA if such failure is continuing after any applicable grace period has elapsed (Master Agreement § 5 [a] [iii] [1]). The CSA states that an Event of Default exists if a party fails to transfer required collateral and such failure continues for two business days after notice of that failure is given (CSA ¶ 7 [i]). If an Event of Default occurs, the non-defaulting party may, upon proper notice to the defaulting party, designate a Early Termination Date for all outstanding transactions (Master Agreement § 6 [a]).
On October 6, 2008, BDC determined that Barclays was overcollateralized, and demanded, pursuant to paragraph 3 (b) of the CSA, that Barclays transfer a $40,140,405.78 Return Amount. Barclays made no payment that day, believing that it owed BDC only $5,080,000 in excess collateral (the undisputed amount). The next day, October 7, 2008, having received no payment by mid-afternoon, BDC again wrote to Barclays asking that it remit the $40 million Return Amount. Barclays, however, did not transfer the $40 million Return Amount by the deadline. Nor did Barclays transfer the $5,080,000 undisputed amount. In fact, Barclays made no payment on October 7, 2008.
The following day, October 8, 2008, Barclays sent BDC a flat $5 million payment, which was a day late and $80,000 less than the undisputed amount. That same day, BDC sent Barclays a “Notice of Failure to Transfer Return Amount” (the default notice). In the default notice, BDC informed Barclays that it had been required, by October 7, 2008, to either pay the $40 million Return Amount or the undisputed amount. The notice declared a Potential Event of Default against Barclays, and advised Barclays that if it failed to cure within two business days, it would be in default under section 5 (a) (iii) (1) of the Master Agreement and paragraph 7 (i) of the CSA. Despite this notice, Barclays did not cure by remitting the balance of the $40 million Return Amount.
*585 On October 13, 2008, BDC sent Barclays a notice declaring Barclays in default for having failed to transfer the $40 million Return Amount within the cure period (the termination notice). The termination notice advised Barclays that the default was continuing, and designated the following day as the Early Termination Date ending all transactions pursuant to section 6 (a) of the Master Agreement. The termination of the agreements obligated Barclays to return BDC’s collateral that it was holding, which, according to BDC, amounted to approximately $297 million. On October 17, 2008, BDC requested Barclays to remit this amount, but Barclays never did. This litigation ensued.
BDC’s default notice stated that in order to have properly disputed the collateral call, Barclays was required to have both notified BDC of the dispute and transferred the undisputed amount of $5,080,000 by October 7, 2008. The evidence in the record establishes as a matter of law that Barclays did not do this. Barclays’ payment of $5 million on October 8, 2008 was a day late. Accordingly, BDC notified Barclays that it had two business days to pay the Return Amount. Still, Barclays did not remit the $40 million, placing it in default. Barclays’ default, in turn, entitled BDC to terminate the transactions and demand return of its collateral.[1] Because Barclays did not return BDC’s collateral, it breached the agreements, and summary judgment on liability should have been granted to BDC.[2]
Barclays unpersuasively argues that its $5 million payment within the two-day period cured any default. Having failed to timely pay the undisputed amount by the deadline, Barclays lost any right it may have had to suspend payment of the full $40 million. Under paragraph 7 (i) of the CSA, a default occurs when a party fails to make a required transfer of collateral, and that failure continues for two business days after notice. In BDC’s default notice, Barclays’ specific failure was identified in the caption: “Notice of Failure to Transfer Return Amount.” The default notice specified that Barclays would be in default if “this failure” — i.e., the failure to pay the $40 million— continued for two business days. Thus, to effect a cure, Barclays was required to transfer the full $40 million Return Amount, not simply the undisputed amount.
*586 There is no merit to the dissent’s contention that the language in BBC’s default notice allowed Barclays to pay either the full Return Amount or the undisputed amount within the cure period. The dissent gives no weight to the heading section of the notice, which plainly identifies the default as “Failure to Transfer Return Amount.” The heading does not advise Barclays of its failure to remit the undisputed amount because by the time the notice was sent, that option was no longer available.
Moreover, it makes little sense, as the dissent suggests, for Barclays to have been given an additional two days to pay the undisputed amount. The dispute resolution procedures in the CSA set forth a very strict and tight deadline requiring Barclays, in the event of a dispute, to transfer the undisputed amount within one business day of the demand, i.e., by October 7, 2008. BBC’s default notice advised Barclays that it failed to meet that deadline and thus was in default on the $40 million collateral call. Barclays’ only option at that point was to remit the full Return Amount, which it failed to do.
The dissent’s view of the options available to Barclays during the cure period turns on the belief that the agreements permitted Barclays to dispute the Return Amount before paying it in full. We disagree. The plain and unambiguous language of the Delivery of Collateral clause requires Barclays to transfer any Return Amount demanded by BBC no later than the business day following the demand. This obligation is unconditional and absolute and exists “ [notwithstanding anything in the [CSA] to the contrary.” Thus, the Belivery of Collateral clause expressly supercedes the form language in the CSA which would have otherwise permitted Barclays to dispute before paying (see H. Fox & Co., Inc. v Blumenfeld, 24 AB3d 722, 722-723 [2d Bept 2005] [contractual provision that applied “(n)otwithstanding anything to the contrary set forth in this lease” was unambiguous and controlled over any other lease provision]). Likewise, the dissent’s conclusion that the Belivery of Collateral clause only modifies the transfer timing provisions of the CSA finds no support in the language of the agreements. Although BBC may have been willing to allow Barclays to pay the undisputed amount if it did so by the close of business on October 7, once that deadline passed, it was entitled to call an event of default based on the wording of the Master Confirmation (see e.g. Triax Capital Advisors, LLC v Rutter, 83 AB3d 490 [1st Bept 2011], appeal dismissed 17 NY3d 804 [2011] [emails between the parties cannot be used to create an ambiguity in an otherwise clear agreement]).
*587 We recognize that the Delivery of Collateral provision is unilateral and requires Barclays, and not BDC, to pay first and dispute later. We disagree, however, with the dissent’s conclusion that this results in a harshly uneven allocation of economic power requiring this Court to, in effect, rewrite the parties’ contact (see Jade Realty LLC v Citigroup Commercial Mtge. Trust 2005-EMG, 83 AD3d 567, 568 [2011], affd 20 NY3d 881 [2012] [“The fact that contractual terms are novel or unconventional does not bring them or the contract in question to the level of absurdity” (internal quotation marks omitted)]). The CSA still required BDC to calculate the Return Amount in a commercially reasonable manner and in good faith (CSA ¶ 11 [d]). Furthermore, if Barclays disagreed with the Return Amount, it could have paid it and then made its own collateral call the next business day (CSA ¶ 3 [a]). And if Barclays wanted to dispute the Return Amount, it still could have done so provided that, as the agreements required, Barclays paid the full Return Amount while the dispute was pending. Since the Delivery of Collateral clause is contained in an agreement negotiated by two sophisticated commercial entities, the court should not, in the guise of contractual interpretation, alter the plain language of the clause (see Jade Realty LLC, 83 AD3d at 568).
There is no merit to the dissent’s suggestion that there is an issue of fact as to whether there was an undisputed amount owed by Barclays after BDC issued its $40 million collateral call. Although there may have initially been some confusion about the amount in dispute, Barclays ultimately concluded that it owed BDC $5,080,000.[3] More importantly, in its response to BDC’s Requests for Admission, Barclays made a formal judicial admission that “$5,080,000 was the undisputed amount ... of BDC’s October 6, 2008 collateral call.” Contrary to the dissent’s position, Barclays does not contest in this litigation that there was an undisputed amount owed to BDC. In fact, Barclays’ appellate brief repeatedly refers to its $5 million payment as “the undisputed amount.”
The dissent also maintains that issues of fact exist as to whether Barclays’ communications with BDC constituted timely notice of a dispute under the CSA. Even if that were true, BDC would still prevail. As noted earlier, the dispute resolution procedures required Barclays to not only provide notice of the dispute by October 7, 2008, but to also transfer the undisputed *588 amount by that date. The evidence in the record undeniably shows that Barclays failed to pay the undisputed amount by the deadline, and establishes as a matter of law that Barclays did not comply with the CSA’s dispute resolution procedures.
Barclays is not entitled to summary judgment on its counterclaims alleging that BDC failed to meet Barclays’ collateral calls made on October 10 and 14, 2008. BDC was not required to meet those calls because at the time they were due, Barclays was already in default and BDC had terminated the transactions (see CSA 1i 4 [a]). Concur — Saxe, DeGrasse and Richter, JJ.

. At the time of the termination notice, Barclays still had not paid the $40 million, thus making its default “continuing” under section 6 (a) of the Master Agreement.

. The motion court properly concluded that BDC could not terminate based on Barclays’ alleged improper valuation of its own post-September 15 collateral calls. BDC failed to provide Barclays with the requisite notice and opportunity to cure this alleged breach.

. Although the dissent states that Barclays did not make this determination until the late afternoon of October 7, the record reflects that Barclays acknowledged that it owed $5,080,000 on the morning of October 7.